1

2

3

4                                UNITED STATES DISTRICT COURT

5                             NORTHERN DISTRICT OF CALIFORNIA

6

7    A.B.,                                          Case No.  24-cv-02490-LJC

8                       Plaintiff,

                                                    **ORDER RESOLVING SOCIAL**
9            v.                                     **SECURITY ACTION**

10   COMMISSIONER OF SOCIAL
     SECURITY,
11
                        Defendant.
12

13   **I.       INTRODUCTION**

14           Plaintiff A.B.[1] challenges the final decision of Defendant the Commissioner of Social

15   Security (the Commissioner),[2] finding A.B. not disabled and thus ineligible for disability

16   insurance and supplemental security income benefits.  The parties filed briefs on the merits in

17   accordance with the Federal Rules of Civil Procedure's Supplemental Rules for Social Security

18   Actions Under 42 U.S.C. § 405(g).  The parties have consented to the jurisdiction of a magistrate

19   judge for all purposes under 28 U.S.C. § 636(c).  For the reasons discussed below, the Court finds

20   in favor of A.B., except as to the specific request for a judicial award of benefits.  The

21   Commissioner's decision is REVERSED, and the case is REMANDED for further administrative

22   proceedings consistent with this Order.

23

24   _____

25   [1] Because opinions by the Court are more widely available than other filings, and this Order
     contains potentially sensitive medical information, this Order refers to the plaintiff only by her
26   initials.  This Order does not alter the degree of public access to other filings in this action
     provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule
27   5-1(c)(5)(B)(i).
     [2] Commissioner Frank Bisignano assumed that role while this case was pending, and is therefore
28   automatically substituted as the defendant in this case under Rule 25(d) of the Federal Rules of
     Civil Procedure.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## II.    BACKGROUND

### A.    Medical Evidence Regarding Finger Impairment

A.B. initially alleged an onset date in 2004 and sought disability insurance benefits as well as supplemental security income. She subsequently amended her alleged onset date to May 22, 2020. Admin. Record (AR, ECF No. 8) at 68.[3]

The administrative record includes evidence related to back problems, plantar fasciitis, other foot and ankle issues, and mental impairments related to depression, social anxiety, and intellectual functioning, among other impairments, injuries, and illnesses. The Court's analysis in this Order turns on an impairment of A.B.'s left hand, so this summary focuses on that issue. This summary is not intended as a comprehensive recitation of the administrative record or of all relevant evidence.

A.B. reported in a questionnaire on February 18, 2022 that she had experienced swelling, shooting paint down her arm, and numbness from a problem with her left fingers, exacerbated by making a fist, lifting objects, "certain positions," and sleeping. AR at 1765. She reported pain at a level of seven out of ten, and that the problem had started on January 3, 2022. AR at 1765. This questionnaire indicates that A.B. is left-handed, AR at 1765, but the record as a whole makes clear that A.B.'s left hand is her non-dominant hand. *See, e.g.*, AR at 51 (A.B.'s testimony).

On February 25, 2022, A.B. visited the Kaiser Permanente orthopedics department for swelling on a joint of her left index finger over "several months." AR at 1757. She had limited range of motion due to pain. AR at 1757. Imaging showed "[n]o acute fracture, dislocation, [or] degenerative changes." AR at 1760. She was diagnosed with a mucus cyst and instructed to follow up for a surgical consultation regarding potential removal. AR at 1760.

On February 28, 2022, Dr. William Slikker noted that A.B. reported having noticed a bump on her finger joint "for months to years which did not change significantly in size," causing stiffness, and that it had "become much more painful over time." AR at 1769. Dr. Slikker

---

[3] This Order cites the administrative record using the continuous page numbers applied by the Commissioner. This Order cites all other documents filed in the record by page numbers assigned by the Court's ECF filing system, unless otherwise indicated.

United States District Court
Northern District of California

1    recorded that A.B. lacked twenty degrees of flexion at the PIP joint of her finger and could not

2    make a fist due to pain.  AR at 1771.  Dr. Slikker discussed the risks and nature of surgery to

3    remove the cyst, and A.B. elected to proceed.  AR at 1771–72.  He also noted a treatment plan of

4    occupational and physical therapy for tennis elbow.  AR at 1772.  A.B. started occupational

5    therapy soon thereafter on March 2, 2022, with notes of pain, numbness, and limited range of

6    motion in her finger, causing "[m]oderate-severe difficulty" in daily living.  AR at 1781–86.

7         A.B. stated in a note to her doctor on March 14, 2022 that she had made an appointment

8    for surgery on April 27th.  AR at 1792.  Her hand felt "a little better" but the bump on her finger

9    still hurt.  AR at 1792.

10        At an occupational therapy appointment on March 17, 2022, A.B.'s pain and range of

11    motion had improved, but her range of motion and strength were still "limited by increased pain

12    locally right over the cyst . . . when in full flexion."  AR at 1797.

13        A note on April 12, 2022 indicated that surgery was scheduled for May 25, 2022.  AR at

14    1848.  In notes from an office visit on May 19, 2022, however, Dr. Jun Matsui recorded that A.B.

15    "had to cancel [the May 25 surgery] due to scheduling conflicts."  AR at 1871.  Dr. Matsui noted

16    that A.B. was unable to make a fist, and sometimes experienced "excruciating pain with very light

17    touch" to the mass on her finger.  AR at 1871.  Dr. Matsui further noted that it was not possible to

18    say with confidence what the mass was without surgical excision, and that further imaging might

19    or might not provide more information, but A.B. and Dr. Matsui agreed that the better approach

20    was to move forward to surgery.  AR at 1874.

21        Though not entirely clear from the record, it appears that A.B.'s surgery may have been

22    further postponed due to her having COVID-19 in August.  *See* AR at 1897–98 (noting a positive

23    Covid test on August 8, 2022); AR at 1902, 1904 (noting a canceled August 10, 2022 "office visit

24    procedure" appointment with Dr. Matsui on August 10, 2022 and a canceled post-operative visit

25    on August 22, 2022).

26        Dr. Matsui performed surgery to remove the mass from A.B.'s finger on September 12,

27    2022.  AR at 1909–17.  Two days later, Dr. Matsui wrote to A.B. that pathology results showed

28    the mass to be "fibromatosis, which is a benign scar tissue type mass."  AR at 1932.

1    On September 26, 2022, A.B. saw a physician's assistant for discomfort and stiffness.  AR

2  at 1935–38.  The physician's assistant "stressed the importance of working on [recovery] exercises

3  as much as possible to get the motion back as soon as possible," because "the longer the fingers

4  don't move, the harder it becomes to get the motion back."  AR at 1938.  In a follow-up

5  communication, Dr. Matsui recommended hand therapy, and A.B. requested an appointment "as

6  soon as [p]ossible."  AR at 1935.

7    At A.B.'s first post-operative occupational therapy appointment on September 30, 2022,

8  she "present[ed] with healing scar, decreased range of motion, stiffness and pain.  Functional

9  deficits include[d] being able to make a fist and use her left hand for daily activities at home and

10  driving."  AR at 1948.  A.B. reported a pain level of "10/10 suddenly sometimes."  AR at 1946.

11  The therapist set the following goals:

> Patient will report pain now at 10/10 to decrease to 5/10 to be able to improve functional use of left hand by 12 weeks.
>
> Patient will be independent with HEP [i.e., Home Exercise Program], including splinting (as needed) and exercises, for symptom management and improving overall function by 12 weeks.
>
> Patient will be able to use left hand at 100% of her PLOF to be able to be independent with ADLs/IADLs by 12 weeks.
>
> Patient will be able to use her left hand to manage kitchen tasks without pain by 12 weeks.

19  AR at 1945.

20    On October 6, 2022, A.B. was reported to be progressing towards her goals, but the

21  therapist noted: "Left finger hurts, yesterday was pretty bad.  She did all the dishes yesterday and

22  overused it.  Finger feels sore today."  AR at 1953–54.

23    After an office visit on October 10, 2022, Dr. Matsui included a note to "Notify therapy

24  and PMD and make chronic pain referral - all on board for possible crps" (i.e., chronic regional

25  pain syndrome).  AR at 1962.

26    At an occupational therapy appointment on October 17, 2022, A.B. was still progressing

27  towards her goals, but still feeling pain, sensitivity, and tightness.  AR at 1969–70.  At her next

28  appointment on October 26, 2022, her pain was better, but she had more stiffness, perhaps from

overuse after a visit to Disneyland.  AR at 1978–80.  She reported that "[b]umping the finger hurts a lot."  AR at 1978.

The report from A.B.'s November 3, 2022 therapy appointment was less positive: "Finger is not well.  Every time she uses the heat, it swells up the finger.  Had too much pain yesterday."  AR at 1987.  She was advised to be more aggressive with her range-of-motion exercises, AR at 1988–89, and prescribed a TENS device for nerve stimulation at home, AR at 1993.  On November 9, 2022, "[n]ot much ha[d] changed with the finger."  AR at 1997.

At a post-operative orthopedic office visit on November 14, 2022, A.B. was experiencing more stiffness and "feeling discouraged," despite spending two hours per day on her exercises.  AR at 2027.  Dr. Matsui again stressed the importance of range-of-motion exercises, because the longer that A.B.'s finger went without moving, the harder it would be to regain that flexibility.  AR at 2029.  Dr. Matsui ordered a nerve study to evaluate possible Type II CRPS.  AR at 2029.  Notes from a November 17, 2022 occupational therapy appointment were similar.  AR at 2040 ("Feeling discouraged but also wanting her finger back to normal.  Trying to work hard on the passive finger flexion.").

As of a December 1, 2022 appointment, A.B. had "good days and bad days."  AR at 2148.  After a video visit on December 7, 2022, Dr. Matsui wrote that having "[r]eviewed her progress," A.B. "does appear to be improving, which is great!"  AR at 2156.  She also noted that A.B. had difficulty remembering previous discussions.  AR at 2156.  Dr. Matsui reached out to A.B.'s primary care doctor Karan Patel to suggest prescribing Lyrica for "something on the crps spectrum."  AR at 2166.  (A.B. later tried taking Lyrica, but discontinued it after it made her sick.  AR at 2188.)  Notes from a video visit with the occupational therapist the same day also indicate some improvement.  AR at 2158–61.

On December 15, 2022, A.B.'s occupational therapist noted that the goal of reducing pain from "10/10" to "5/10" had been achieved and that A.B. was "[d]oing better," though she still had pain.  AR at 2179–80.  On December 29, 2022, she had also achieved the goal of independent home exercises, and "used her hand over the holiday and it went fine."  AR at 2191.  She continued experience stiffness but also to show improvement at a January 4, 2023 video visit.  AR

at 2199–206.

A nerve study on January 10, 2023 for carpal tunnel syndrome and Type 2 CRPS came back normal.  AR at 2211.

A.B. "[c]ontinue[d] to have significant [index finger] stiffness" at her January 12, 2023 occupational therapy appointment."  AR at 2220.  At an office visit with Dr. Matsui on January 19, 2023, A.B. noted improvement with respect to pain and flexion, though she was concerned about her finger "turning inward."  AR at 2225.  She was "now able to go outside and carry stuff in."  AR at 2225.

On February 13, 2023, A.B. was reported to have met goals of reducing pain from "10/10" to "5/10" and achieving an independent home exercise program (HEP) in December, but still "[p]rogressing towards goal[s]" of 100% use of her left hand, independent activities of daily living, and being "able to use her left hand to manage kitchen tasks without pain."  AR at 2281.  Her occupational therapist reported "[s]light improvement with finger motion," and that A.B. "needs to continue to apply adequate force to stretch the finger due to pain."  AR at 2285.  Dr. Matsui encouraged A.B. to push harder in her exercises, and recognized that she was "spending a tremendous [amount of] time" on them.  AR at 2228.

A.B. canceled a January 25, 2023 appointment because she and her son were sick.  AR at 2236.

In notes from a February 1, 2023 video visit, the occupational therapist noted "[n]o significant improvement with finger motion."  AR at 2242.  A.B.'s finger was swollen, she still could not make a fist or touch her finger to her palm, and her therapist was concerned that she might not be pushing hard enough in her stretching exercises for them to be productive.  AR at 2239–42. Notes from around this period also address a "droop" at the final joint of A.B.'s index finger, which her caregivers indicated was unlikely to resolve and less important than improving range of motion at the stiff middle joint.  *E.g.*, AR at 2242, 2246.

A February 13, 2023 occupational therapy note indicates "[s]light improvement with finger motion," though A.B. was still working towards "the goal of having the fingertip reach the palm, passively and actively."  AR at 2285.

6

1    On February 22, 2023, A.B. canceled an appointment because she was at Lake Tahoe.  AR

2    at 2291.

3    On February 27, 2023, as on previous occupational therapy visits, A.B. was still listed as

4    "[p]rogressing towards" the goals of full and independent use of her left hand for kitchen tasks and

5    other activities of daily living.  AR at 2293.  Her therapist listed the following notes:

> Subjective: Used a hot tub to soak the hand and it felt fine. No
> increased swelling. Still stiff. The hand feels good. States pain and
> tenderness at the Left IF [apparently meaning index finger] A1 pulley
> and A3 pulley areas.

9    AR at 2294.  Her pain level was still listed as "10/10 suddenly sometimes."  AR at 2294.  The

10    therapist's assessment noted pain, stiffness, and limited range of motion, and "suspect[ed] trigger

11    finger of left IF at A1 and A3 (palpable swelling noted today)."  AR at 2297.

12    Dr. Rose Lewis, an internist, performed a consulting examination and prepared a report on

13    February 28, 2023.  AR at 2048–58.  Dr. Lewis noted that A.B. reported "frequently drop[ping]

14    things," "difficulty doing buttons, shoelaces, and zippers," and inability to "open bottles and jars."

15    AR at 2049.  A.B. told Dr. Lewis that she could "do all household chores" like vacuuming and

16    laundry, but "has to do them in very small amounts with breaks."  AR at 2049.  Dr. Lewis's

17    assessment of range of motion of various joints included: "FINGER/THUMB: Flexion/extension

18    of the phalanx 70 degrees and distal phalanx 90 degrees bilaterally."  AR at 2051.  She assessed

19    A.B.'s grip strength at "5/5 bilaterally."  AR at 2051.  Dr. Lewis determined that A.B. was

20    "capable of . . . handling frequently," and only "capable of fingering occasionally because of the

21    decrease in fine finger movement" and "osteoarthritis of the . . . fingers," among other causes.  AR

22    at 2051–52.[4]  Contradicting that assessment, Dr. Lewis checked boxes in a form at the end of her

23    report indicating that A.B. was capable of frequent fingering.  AR at 2055.

24    In notes from a March 1, 2023 video consultation, A.B. was still listed as having met her

---

[4] It is difficult to see the connection between A.B.'s fingering limitation and some of the other
conditions that Dr. Lewis cites for it, like "decreased range of motion of the back and fall risk."
AR at 2052.  It is also not obvious why, despite citing "fall risk" as a reason for a fingering
limitation (as well as various other limitations like lifting and carrying), Dr. Lewis assessed "no
limitations with working at unprotected heights."  AR at 2052.

United States District Court
Northern District of California

United States District Court
Northern District of California

goal of decreased pain in December, but the goal of an independent home exercise program was no longer listed as met, and instead included the note: "Patient now with beginning L IF trigger finger." AR at 2302. Her goals related to achieving full use and independent activities also had new notes that she was "[l]imited by new symptoms of L index trigger finger." AR at 2302. A note indicated that A.B. had started experiencing swelling at the base of her finger "[a]bout a month ago," and that she experienced "[n]o clicking nor feeling of locking, just pain." AR at 2303. The occupational therapist noted: "Patient with beginning symptoms of L index trigger finger, will be checked by Dr. Matsui in the office. Splinting is not recommended since she does not have full active composite L IF flexion anyway. Ice massage introduced." AR at 2307. A note that appears to be from Dr. Matsui states that A.B.'s finger would be "re-examine[d] in the office," that she would order MRIs of A.B.'s head and neck, and that she would consider a cortisone injection and/or a referral to the chronic pain department. AR at 2311.

Dr. Matsui's notes from a March 6, 2023 office visit indicate improvement, though apparently framed at least in part in relation to previous reports of lateral epicondylitis (also known as tennis elbow):

> About a year ago notes to have lateral epi - that is way better now, no more pain
>
> Now, overall, doing better
> Doing more stuff
> Picking up things without thinking about it
> Occasionally continues to bypass the finger
> Has continued to do exercises at home

AR at 2316. Dr. Matsui noted stiffness in A.B.'s finger and some limitation in its flexibility. AR at 2317. She found "[n]o electrophysical evidence of CTS [apparently carpal tunnel syndrome] or another upper body neuropathy." AR at 2318. Dr. Matsui noted that she had "previously discussed the diagnosis of CRPS" (chronic regional pain syndrome) with A.B., and that A.B. did "not appear to have type II CRPS" based on a "negative nerve study." AR at 2318. According to Dr. Matsui, A.B. "[o]verall . . . note[d] improvement." AR at 2319. Dr. Matsui advised A.B. to push harder with her finger exercises. AR at 2319.

On March 13, 2023, the goal of an independent home exercise program was reported to

have been met once again as of that date, but the goals related to full use of A.B.'s hand for kitchen tasks and other activities were still listed as "[l]imited by new symptoms of L index trigger finger." AR at 2330. An occupational therapist reported that "[o]verall, [A.B.'s] finger feels stiff." AR at 2331. A.B. was advised to "[c]ontinue with heat and stretching at the left IF PIP for flexion," with a note that she "understands this will take time to see if there's any improvement." AR at 2334.

On April 11, 2023, Dr. Stephanie Norton wrote to A.B. that her MRI findings had some abnormalities related to her brain and back, but nothing "that would cause any problems with [her] finger." AR at 2337.

In the final treatment note that appears in the record, from April 17, 2023, the status of A.B.'s recovery goals had not changed from the March 13, 2023 treatment notes. AR at 2343. "Her finger [was] still stiff." AR at 2343. A.B. was still working towards a goal of being able to make a fist or touch her palm with her index finger. AR at 2346. The occupational therapist noted that it "may take up to a year to see the full potential of the hand." AR at 2346.

In a chart showing "AROM Digits to DPC (in cm)," which appears to be a range-of-motion measurement where lower numbers reflect better performance and zero is optimal, A.B.'s results range from 5 centimeters at her first post-surgery therapy session on September 30, 2022, to 6.5 centimeters at several subsequent sessions, to 3 centimeters at final (at least in the record) April 17, 2023 visit. AR at 2345. Before her surgery, the same metric at her March 2 and 17, 2022 occupational therapy appointments was noted as 3 centimeters and 1 centimeter respectively, with a note that her range of motion was still "limited" at the second of those two appointments despite "[s]ignificant improvement" as compared to the first. AR at 1796–97.

**B.    April 26, 2023 Administrative Hearing**

At an April 26, 2023 administrative hearing,[5] A.B. testified that she cannot bend her index finger on her non-dominant left hand after having surgery the previous September to remove a

---

[5] The first administrative hearing on A.B.'s present application occurred on November 2, 2022, but A.B. did not testify at that hearing and the ALJ held the record open for additional examinations and evidence. AR at 61–82.

1    bump.  AR at 50.  It initially improved "a little bit" in post-surgery rehab, but she regressed and

2    "now it's just not moving."  AR at 50–51.  She stated that her doctor told her that the finger might

3    or might not heal, and most recently told her that it likely would not.  AR at 50.  In response to a

4    question from her attorney regarding how this injury affected her at home, A.B. testified as

5    follows:

6            Buttoning shirts, putting on a bra, holding cups, doing dishes, even
             sweeping the floor, I have to do it one-handed. I can't grab, that's my
7            problem. And if I do grab, the finger is weak. So, I dropped a cup, so
             I'm having a hard time. And my finger, when I do drive, it sticks
8            outward. So, a lot of times I'm trying to remember to bend it, but it
             doesn't bend.
9

10   AR at 51.

11           A.B. also testified that she could only stand for around fifteen or twenty minutes at a time

12   due to plantar fasciitis, tendonitis, and back problems, and could only sit for the same amount of

13   time without needing to move around due to her back.  AR at 51–52.  She said that she could not

14   stand for three or four hours, and that if she did, "the next day [she] would be in bed."  AR at 52.

15   A.B. testified that her husband "does most of the cooking" and helps their thirteen-year-old son

16   with his homework, and her son cleans the house. AR at 57–58.  She stated that she is sometimes

17   able to take care of herself, but sometimes stays in bed all day due to headaches and back pain.

18   AR at 59.  A.B. also noted that she had a learning disability that caused difficulty with writing,

19   spelling, and comprehension.  AR at 58.

20           Dr. Jay Toews, Ed.D., testified as a medical expert regarding A.B.'s mental impairments.

21   AR at 46–49.  Dr. Toews testified that A.B. had moderate limitations in each of the four functional

22   categories for the "Paragraph B" criteria in the listing of impairments, and that she meets the

23   criteria for disability based on several listed impairments.  AR at 47.  (As discussed further below,

24   moderate limitations in those categories are not actually sufficient to establish disability under the

25   listings.)  Dr. Toews also testified that, among other limitations, A.B. would probably miss more

26   than three days of work per month due to social anxiety.  AR at 49.

27           The ALJ presented a vocational expert (VE) with a hypothetical functional capacity

28   involving light work and a number of further physical and mental restrictions, which tracks the

10

residual functional capacity (RFC) that the ALJ ultimately assessed in her decision discussed below.  AR at 53–54.  The VE testified that a person with those limitations could work as a mail sorter, merchandise marker, or routing clerk, which together account for somewhat less than 200,000 jobs in the national economy.  AR at 54.  If the hypothetical were further limited to sedentary work, the VE testified that such a person could work as a document preparer, election clerk, or addresser, with far fewer jobs available in those categories.  AR at 54–55.  The VE testified that someone who was absent from work at least three times per month or off task fifteen percent of the time (including if time off task were caused by breaks for back pain) would not be able to maintain employment AR at 55–56, 57.  In response to questions from A.B.'s attorney, the VE testified that if someone meeting the ALJ's first hypothetical were further limited to "only occasional use of the hands," they would only be able to work as an election clerk or "callout operator," both of which require talking with people by telephone to give out information.  AR at 56.

### C.     Five-Step Framework

The Social Security Administration uses a five-step process to determine whether claimants are entitled to disability benefits:

> Step 1. Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "*not disabled*" within the meaning of the Social Security Act and is not entitled to disability insurance benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(b).

> Step 2. Is the claimant's impairment severe? If not, then the claimant is "*not disabled*" and is not entitled to disability insurance benefits. If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(c).

> Step 3. Does the impairment "meet or equal" one of a list of specific impairments described in the regulations? If so, the claimant is "*disabled*" and therefore entitled to disability insurance benefits. If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(d).

United States District Court
Northern District of California

11

Step 4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is "*not disabled*" and is not entitled to disability insurance benefits. If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step. See 20 C.F.R. § 404.1520(e).

Step 5. Is the claimant able to do any other work? If not, then the claimant is "*disabled*" and therefore entitled to disability insurance benefits. *See* 20 C.F.R. § 404.1520(f)(1). If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do. There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert, or (2) by reference to the Medical–Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner meets this burden, the claimant is "*not disabled*" and therefore not entitled to disability insurance benefits. *See* 20 C.F.R. §§ 404.1520(f), 404.1562. If the Commissioner cannot meet this burden, then the claimant is "*disabled*" and therefore entitled to disability benefits. *See id.*

*Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999) (footnote omitted); *see also Maxwell v. Saul*, 971 F.3d 1128, 1130 n.2 (2020).[6]  "At steps one through four, the claimant retains the burden of proof; at step five, the burden shifts to the Commissioner." *Maxwell*, 971 F.3d at 1130 n.2.

To qualify as a disability, a claimant's inability to work must either have lasted, or be expected to last, for at least twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 404.1509; *Barnhart v. Walton*, 535 U.S. 212, 217–22 (2002); *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995).

For Step 3 of the analysis, nearly all listed impairments related to mental health or functioning incorporate a test of whether a claimant has either "extreme" limitations in one category, or "marked" limitations in two categories, with respect to a claimant's abilities to: (1) "Understand, remember, or apply information"; (2) "Interact with others"; (3) "Concentrate, persist, or maintain pace"; and (4) "Adapt or manage oneself."  These standards are often referenced as the "Paragraph B criteria."  *See* Listing 12.00(A)(2).  For some listings, that standard

---

[6] The regulatory citations in this passage apply to adjudication of Disability Insurance benefits and refer to an earlier version of 20 C.F.R. § 404.1520 that is substantially similar to the current language of that regulation.  20 C.F.R. § 416.920 sets forth materially identical steps to assess disability for the purpose of Supplemental Security Income benefits, which are at issue in this case.

1    can be substituted by a claimant showing that they meet separate "Paragraph C criteria" or other

2    listing-specific standards. *Id.*; *see also* Listing 12.05(A).

3         **D.**      **The ALJ's Decision**

4        In her August 16, 2023 decision, the ALJ noted that A.B. had previously unsuccessfully

5    applied for disability benefits, with another ALJ having found her not disabled on November 1,

6    2019, and another judge of this Court having affirmed that decision on October 19, 2021. AR at

7    23; *see* AR at 177–98 (prior decision by Judge Ryu). A.B. was therefore required to show

8    changed circumstances to rebut a presumption of non-disability. AR at 23. The ALJ stated that

9    A.B., who was represented by counsel in administrative proceedings, amended her alleged onset

10    date in the present application to May 22, 2020, resulting in dismissal of her claim for Title II

11    disability insurance benefits (due to onset after her date last insured) and leaving only a claim for

12    Title XVI supplemental security income (SSI). AR at 22–23. The dismissal of her claim for Title

13    II benefits is not in dispute in the present appeal.

14        At Step 1, the ALJ determined that A.B. had not engaged in substantial gainful activity

15    since her alleged onset date. AR at 25.

16        At Step 2, the ALJ identified the following severe impairments: "depressive disorder;

17    anxiety disorder; borderline intellectual functioning; dextroscoliosis of the thoracic spine;

18    degenerative disc disease; bilateral plantar fasciitis; left index finger cyst, status post excision in

19    September 2022." AR at 25. The ALJ determined that certain past knee and ankle injuries,

20    obstructive sleep apnea, a potential personality disorder, and other medical issues referenced in the

21    record were not severe impairments because they had no more than a minimal effect on A.B.'s

22    ability to work. AR at 26.

23        At Step 3, the ALJ determined that A.B.'s impairments did not meet or equal any listing.

24    AR at 26–28. The ALJ found that A.B.'s musculoskeletal disorders did not meet the functional

25    requirements of listings 1.15 ("Disorders of the skeletal spine resulting in compromise of a nerve

26    root(s)"), 1.16 ("Lumbar spinal stenosis resulting in compromise of the cauda equina"), or 1.18

27    ("Abnormality of a major joint(s) in any extremity"), without analysis. AR at 26. A.B. does not

28    challenge that determination.

United States District Court
Northern District of California

13

1    The ALJ then determined that A.B. did not meet the Paragraph B criteria for any mental

2    impairment (specifically noting listings 12.04, 12.05, 12.06, and 12.11) because she had no more

3    than moderate limitations in any of the four functional categories. AR at 27–28. The ALJ did not

4    address any other listings at Step 3.

5    For the purposes of Steps 4 and 5 (A.B.'s ability to perform past work or other work), the

6    ALJ determined that A.B. had:

7            the residual functional capacity [(RFC)] to perform light work as
             defined in 20 CFR 404.1567(b) and 416.967(b) except that she can
8            never climb ladders, ropes, or scaffolds. She can frequently climb
             ramps and stairs. She can occasionally stoop and kneel. She must
9            avoid concentrated use of hazardous machinery and concentrated
             exposure to unprotected heights. Work is limited to simple, as defined
10           in the DOT as SVP levels 1 and 2, routine and repetitive tasks. The
             claimant can work in a low stress job, defined as requiring only
11           occasional decision-making and occasional changes in the work
             setting. She can have no interaction with the general public. She can
12           work around coworkers throughout the day, but with only occasional
             interaction with the coworkers.
13

14   AR at 28.

15   The ALJ noted A.B.'s testimony that she could not walk for more than fifteen or twenty

16   minutes at a time due to back and foot pain, that she was unable to bend her left index finger since

17   her September 2022 surgery (thus causing difficulty with various daily tasks), and that her mental

18   impairments caused low motivation, fatigue, social anxiety, and panic attacks. AR at 29. The

19   ALJ found "that the claimant's medically determinable impairments could reasonably be expected

20   to cause the alleged symptoms," but that her "statements concerning the intensity, persistence and

21   limiting effects of these symptoms are not entirely consistent with the medical evidence and other

22   evidence in the record." AR at 29.

23   With respect to A.B.'s ability to stand and walk, the ALJ relied on observations of normal

24   gait, her ability "to perform tandem and toe-heel walking and get on and off the examination table

25   without difficulty," her own reports that she performed household chores (including in her attic),

26   and an absence of significant objective findings related to A.B.'s foot and back pain. AR at 29–

27   30. The ALJ determined that A.B. could stand and walk for up to six hours, rather than the fifteen

28   or twenty minutes at a time that she testified she could manage. AR at 29. The ALJ found Dr.

United States District Court
Northern District of California

14

1    Rose Lewis's opinions—which included more significant restrictions on standing and walking

2    than assessed by the ALJ, but less severe than A.B.'s testimony—"only somewhat persuasive."

3    AR at 33.  The ALJ rejected the opinions of Dr. Larry Woodcox, a podiatrist who treated A.B. and

4    assessed her as capable of only sedentary work.  AR at 33–34.

5        The ALJ addressed A.B.'s finger impairment (which is a focus of this Order) as follows:

> With regard to the claimant's complaints of left-hand dysfunction, I
> find that limitation to light lifting and carrying accounts for her
> symptoms and is supported by the weight of the longitudinal
> evidence. The record does not show complaints or findings
> warranting limitation dating back to 2020. The record shows that the
> claimant reported left index finger pain, swelling, and stiffness in
> February 2022, almost two years after the amended alleged onset date,
> and was treated for a cyst (Exhibits C8F/258, 430 (finger mass
> consistent with superficial fibromatosis); C12F/7). Radiographs of
> the left hand showed no fracture, dislocation, or degenerative changes
> in the hand (Exhibit C8F/258). The claimant underwent a procedure
> to excise the cyst on September 12, 2022 (*see, e.g.,* Exhibits C8F/430;
> C12F/113).
>
> Medical records and postoperative occupational therapy notes show
> that the claimant reported overall symptom improvement, that
> diagnostic studies showed no evidence of radiculopathy or upper
> extremity neuropathy, and that clinical findings were both modest and
> limited locally to the claimant's non-dominant left index finger. The
> claimant met two therapeutic goals and was progressing towards the
> other two goals (Exhibits C8F/451, 455, 459, 467, 475, 476, 484, 494,
> 537; C12F/121, 130). The claimant's provider, Dr. Matsui, expressed
> some concern for complex regional pain syndrome (CPRS [sic] II)
> due to the claimant's reports of hot and cold sensitivity, but later
> reported that the claimant did not appear to have CPRS [sic] II
> (Exhibit C8F/130, 137, 158 (1/23), 460).
>
> Dr. Matsui also referred the claimant for nerve conduction studies to
> rule out carpal tunnel syndrome; the studies were negative for carpal
> tunnel syndrome as well as for another upper extremity neuropathy
> (Exhibit C12F/142). During a neurological consult in February 2023,
> Dr. Norton observed mild left-hand atrophy. Although the claimant
> reported a lifelong size difference in her right (dominant) and left
> hands, Dr. Norton ordered a brain MRI and cervical spine MRI to rule
> out myelopathy and radiculopathy (Exhibit C12F/269). The March
> 12, 2023 MRI of the cervical spine showed bulging discs at C4-5 and
> C5-6 without cord signal abnormalities and no significant
> degenerative changes in the remainder of the cervical spine (Exhibit
> C12F/256). Dr. Norton informed the claimant that the imaging studies
> did not show neurologic disease or any changes that would contribute
> to her reports of pain and stiffness in the left finger (Exhibit
> C12F/268).
>
> During an occupational therapy appointment in late-February 2023,
> the claimant's therapist noted swelling and suspected early left index

15

1
2
3
4
5

> trigger finger (Exhibit C12F/228). However, the record does not show that these new symptoms could be expected to last a continuous period of at least 12 months. During an orthopedic follow up a week later, the claimant reported doing better overall, doing more, and picking things up without thinking about it (Exhibit C12F/247).An examination showed some stiffness and a stable distal interphalangeal joint (DIP) droop in the left index finger but improved flexion (Exhibit 12F/248). Despite these findings, the claimant also displayed 5/5 grip strength bilaterally at the February 2023 consultative examination (Exhibit C10F/4).

6    AR at 30.

7        The ALJ addressed A.B.'s finger again in the context of Dr. Lewis's report:

8
9
10
11
12
13

> In addition, the evidence does not support limitation to occasional fingering. As discussed at length above, the record does not show complaints or findings warranting limitation dating back to 2020. Clinical findings have been modest and limited locally to the claimant's non-dominant left index finger, and the evidence does not show that the very recent symptoms of early left trigger finger could be expected to last for at least a year. In addition, the available imaging studies of the left hand did not show degenerative changes, imaging of the cervical spine did not show nerve involvement, and nerve conduction studies did not show evidence of upper extremity neuropathy.

14    AR at 33.

15        The ALJ also addressed A.B.'s mental impairments, finding clinical psychologist Dr.

16    Megan Stafford's opinions "generally persuasive," and apparently more persuasive than those of

17    other doctors who addressed those impairments.  AR at 31.  The ALJ rejected the more severe

18    impairments assessed by other examining psychologists (Drs. Wiebe and Catlin) and testifying

19    medical expert Dr. Toews, and also rejected the less severe findings by state agency psychological

20    consultants and medical expert Dr. Linda Miller.  AR at 31–33.

21        At Step 4, the ALJ determined that A.B. had no relevant past work experience, and

22    therefore could not perform her past work.  AR at 34.

23        At Step 5, the ALJ credited the VE's testimony that someone with A.B.'s age, education,

24    and work experience, as well as the RFC that the ALJ assessed, would be able to work as a mail

25    sorter, merchandise marker, or routing clerk.  AR at 34–35.  The ALJ therefore determined that

26    A.B. was not disabled.  AR at 35.

27        **E.    The Parties' Arguments**

28        A.B. contends that the ALJ erred in rejecting A.B.'s testimony regarding the extent of

United States District Court
Northern District of California

16

1    limitations to her left index finger.  ECF No. 11 at 8–9.  Under the same heading regarding the

2    ALJ's purportedly improper rejection of her symptom testimony, she also disputes some of the

3    ALJ's reasons for discounting the severity of her mental impairments, but she does not identify

4    any specific testimony on that subject that the ALJ erred in failing to credit.  *Id.* at 9–11.

5        Addressing medical opinion evidence, A.B. contends that the ALJ offered insufficient

6    reasons to reject portions of Dr. Lewis's opinions regarding A.B.'s physical impairments

7    (including but not limited to impairments of her fingers).  *Id.* at 11–12.  A.B. argues that the ALJ

8    erred in rejecting opinions of examining psychologists Drs. Katherine Wiebe and Laura Catlin and

9    medical expert Dr. Toews, *id.* at 12–14, and failed to address discrepancies in the less restrictive

10   opinions of Dr. Megan Stafford, which the ALJ credited despite A.B.'s low scores on some of the

11   tests she administered, *id.* at 14–15.  A.B. also contends that the ALJ should have credited

12   opinions of her treating podiatrist Dr. Larry Woodcox and should not have credited non-

13   examining consultants.  *Id.* at 15–17.

14       A.B. argues that if the ALJ properly credited psychological opinion evidence, she would

15   be found disabled at Step 3 based on the Paragraph B listing criteria for mental health

16   impairments.  *Id.* at 17–18.  She further argues that the ALJ erred in her RFC assessment in a

17   manner that would have affected whether work was available at Step 5, *id.* at 18–20, and that the

18   ALJ failed to develop the record to address ambiguities in Drs. Lewis and Stafford's reports, *id.* at

19   20–21.  A.B.'s opening brief concludes with a request that the Court instruct the Commissioner to

20   award benefits rather than remanding for further administrative proceedings, relying primarily on

21   references to her previous arguments.  *Id.* at 21–22.

22       The Commissioner argues that the ALJ properly credited some but not all of the symptoms

23   and limitations asserted by A.B. and her doctors, and addressed them by incorporating significant

24   restrictions in A.B.'s RFC.  ECF No. 15 at 7.  The Commissioner contends that the ALJ properly

25   rejected some of A.B.'s testimony regarding the severity of her physical impairments based on a

26   lack of objective medical findings, including with respect to her finger dysfunction.  *Id.* at 7–9.

27   The Commissioner argues that A.B.'s reported activities and a lack of mental health treatment

28   undermined her testimony regarding mental impairments.  *Id.* at 9–12.  According to the

United States District Court
Northern District of California

1   Commissioner, the ALJ properly evaluated conflicting medical opinion evidence and treatment

2   records with respect to both physical and mental impairments. *Id.* at 12–20. The Commissioner

3   therefore contends that the ALJ properly determined that A.B. did not meet the criteria for a listing

4   at Step 3, *id.* at 21–24, and properly assessed her RFC to consider the availability of other work at

5   Step 5, *id.* at 24–26. The Commissioner asserts that the ALJ had no need to further develop the

6   record. *Id.* at 26–27. The Commissioner asks that if the Court finds any error, the Court remand

7   for further administrative proceedings rather than an immediate award of benefits. *Id.* at 27–28.

8           In her reply brief, A.B. again argues that the ALJ should have credited her testimony

9   regarding her finger impairment, ECF No. 16 at 2–3, and unspecified testimony regarding mental

10  impairments, *id.* at 3–4. The only medical opinion evidence that A.B. addresses in her reply is Dr.

11  Lewis's report on A.B.'s physical impairments. *Id.* at 5–6. Arguing for an award of benefits

12  rather than further proceedings, A.B. contends that a limitation to occasional fingering would

13  require a finding of disability at Step 5 based on the VE's testimony that the only jobs

14  accommodating such a restriction (and the other limitations assessed by the ALJ) would require

15  interaction with the public. *Id.* at 6–7.

### III.   LEGAL STANDARD

17          In cases challenging the denial of disability benefits, district courts have authority to

18  review and "affirm[], modify[], or revers[e] the decision of the Commissioner of Social Security,

19  with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "An ALJ's disability

20  determination should be upheld unless it contains legal error or is not supported by substantial

21  evidence," which "'means more than a mere scintilla, but less than a preponderance; it is such

22  relevant evidence as a reasonable person might accept as adequate to support a conclusion.'"

23  *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d

24  1028, 1035 (9th Cir. 2007)). A court must consider evidence both supporting and detracting from

25  the Commissioner's decision; if the evidence could reasonably support either outcome, the court

26  may not substitute its judgment for that of the ALJ. *Id.* at 1010. Courts "review only the reasons

27  provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon

28  which he did not rely." *Id.*

IV.    **ANALYSIS**

A.    **The ALJ Erred in Rejecting A.B.'s Testimony Regarding Her Finger Impairment**

A.B. contends that the ALJ erred in rejecting both her own testimony regarding her finger impairments and Dr. Lewis's assessment that she was limited to occasional fingering.  ECF No. 11 at 8–9, 12–13.  The Court agrees as to the former argument, and does not resolve the latter.

As discussed in detail above, A.B. testified that her left index finger remains weak and difficult to bend, requiring her to do basic tasks like dressing herself and household chores one-handed.  AR at 51.  She also testified that her doctor (apparently Dr. Matsui) told her that it "may heal, [or] it may not."  AR at 50.  According to A.B., "the last time [she] saw her she said she [did not] think it's going to heal" because "[i]t's been too long."  AR at 50.

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited."  *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  *Id.* (quoting *Garrison v. Colvin*, 759 F.3d 995, 1014–15 (9th Cir. 2014)).  If the claimant meets this requirement and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.  This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases."  *Id.*  To satisfy the "clear and convincing reasons" requirement, "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (quoting *Reddick*, 157 F. 3d at 722).

In weighing the claimant's credibility, the ALJ may consider many factors, including "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to

1    follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v.*

2    *Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th

3    Cir. 1996)).  The ALJ's reasons must be supported by substantial evidence in the record. *Thomas*

4    *v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).

5        Here, the ALJ found that A.B.'s "medically determinable impairments could reasonably be

6    expected to cause the alleged symptoms,"[7] AR at 29, thus requiring clear and convincing reasons

7    to reject her testimony, *Trevizo*, 871 F.3d at 678.[8]  But rather than "identify[ing] what testimony is

8    not credible" as required by *Brown-Hunter*, 806 F.3d at 493, the ALJ merely asserted that A.B.'s

9    "statements concerning the intensity, persistence and limiting effects of these symptoms are not

10   entirely consistent with the medical evidence and other evidence in the record, for the reasons

11   explained in this decision," AR at 29.  Though the ALJ went on to explain her reasoning for the

12   RFC that she assessed, she did not identify specific testimony about A.B.'s finger impairment that

13   she found not credible.  *See* AR at 30.

14       For example, it is not clear whether the ALJ credited or rejected A.B.'s testimony that she

15   had limited strength and range of motion in her left index finger, that she therefore needed to do

16   many daily activities with only one hand, and that she regularly dropped things, or whether the

17   ALJ believed A.B.'s testimony that her doctor did not expect her finger to recover.  *See* AR at 50–

18   51.  Viewed in conjunction with the administrative record as a whole, the ALJ's decision is

19   ambiguous.  It is not apparent whether the ALJ concluded that A.B. did *not* do chores one-handed

20   or drop things frequently (as she testified), or that she did so but such household limitations did

21   not support a further vocational restriction, or that she did so and would warrant a vocational

22   restriction except that her symptoms were not expected to last for at least a year—which in turn

23   raises the unanswered question of whether the ALJ rejected A.B.'s testimony as to what her doctor

24   told her.  At least under the circumstances of this case, the ALJ's "[g]eneral findings are

---

[7] *See also* AR at 25 (identifying "left index finger cyst, status post excision in September 2022" as
a severe impairment at Step 2).
[8] The Commissioner notes a longstanding objection to the "clear and convincing" standard in this
context, but does not dispute that this Court is bound by that Ninth Circuit precedent.  ECF No. 15
at 7 n.2.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    insufficient" to permit meaningful review, *see Brown-Hunter*, 806 F.3d at 493, and that deficiency

2    alone warrants remand.

3        To the extent that the ALJ's finding that the "limitation to light lifting and carrying

4    accounts for her [finger] symptoms," AR at 30, implicitly rejects A.B.'s testimony regarding

5    difficulty with daily activities, the ALJ did not identify clear and convincing reasons for such a

6    conclusion.  The ALJ cites evidence finding no fracture or neurological basis for A.B.'s

7    impairment, AR at 30, but that alone does not show that the impairment does not exist—

8    particularly where the ALJ herself acknowledged that that A.B.'s "medically determinable

9    impairments could reasonably be expected to cause the alleged symptoms."  AR at 29.  Contrary

10    to an implication of the Commissioner's brief, the lack of any "fracture, dislocation, . . .

11    degenerative change," or test showing the *reason* for A.B.'s finger pain and dysfunction does not

12    "contradict[]" her testimony and treatment records documenting pain and limited range of motion.

13    *See* ECF No. 15 at 8.  Similarly, though the ALJ accurately noted that some treatment records

14    showed improvement, AR at 30, that does not contradict A.B.'s testimony regarding the ongoing

15    nature of her finger impairment and its effects on her ability to perform basic tasks.  Improvement

16    does not, on its own, establish any particular level of capacity, and "it is error to reject a claimant's

17    testimony merely because symptoms wax and wane in the course of treatment." *Garrison*, 759

18    F.3d at 1017.

19        As far as the Court can discern from the record, none of A.B.'s doctors questioned the

20    *existence* of A.B.'s finger pain, weakness, and stiffness even as they were unable to determine its

21    cause.  Nor does the ALJ assert any such doubt by A.B.'s treatment providers.  The only doctor

22    who provided any assessment of A.B.'s functional capacity with respect to her fingers, Dr. Lewis,

23    assessed at least some fingering limitations (though her report is ambiguous as to the degree of

24    such limitations).  AR at 2051–52, 2055.  And while the ALJ cites A.B.'s daily activities as

25    evidence contradicting her testimony regarding the degree of her standing, walking, and mental

26    limitations, AR at 31–34, the ALJ did not cite any such activities as contradicting A.B.'s

27    testimony regarding her hand impairment.  The only evidence that the ALJ cites of A.B.'s specific

28    capability in using her hand is that she "reported doing better overall, doing more, and picking

things up without thinking about it" at a March 6, 2023 office visit, and that Dr. Lewis assessed "5/5 grip strength bilaterally" in February of that year. AR at 30 (citing AR at 2051, 2316). When viewed in conjunction with ongoing records of pain and limited range of motion over the remaining subsequent period (around two months) captured in the record—evidence that the ALJ largely did not address—those references alone are not clear and convincing reasons to reject A.B.'s testimony.

As a related issue not addressed in Plaintiff's briefs, the ALJ's discussion of A.B.'s potential CRPS diagnosis also appears to be flawed. On March 6, 2023, Dr. Matsui noted that she had "previously discussed the diagnosis of CRPS" (chronic regional pain syndrome) with A.B., and that A.B. did "not appear to have type II CRPS" based on a "negative nerve study." AR at 2318. The ALJ seems to have taken that study as laying to rest any question of A.B. suffering from CRPS. AR at 30. But *type II* CRPS inherently suggests that it is not the only form of that condition, and in fact it is not:

> Complex Regional Pain Syndrome ('CRPS') is a syndrome believed to be related to the sympathetic nervous system that can appear after a bone or soft tissue injury. There are two types of CRPS: Type I is known as Reflex Sympathetic Dystrophy ('RSD') and occurs when there has been no injury to the nerve. Type II is sometimes known as Causalgia and occurs when there is a demonstrable nerve injury.

*See Wendelin v. Astrue*, No. 08-CV-00238-CMA, 2009 WL 723331, at *1 (D. Colo. Mar. 18, 2009) (record citations omitted), *aff'd*, 366 F. App'x 899 (10th Cir. 2010).

Accordingly, the determination that A.B. did not have Type II CRPS due to the lack of an identifiable nerve injury would not preclude a finding of Type I CRPS. The Commissioner has promulgated a Social Security Ruling (SSR)[9] specifically addressing Type I CRPS, recognizing it as a potentially disabling impairment that can sometimes result from surgery to an extremity. SSR 03-2p, Titles II & XVI: Evaluating Cases Involving Reflex Sympathetic Dystrophy

---

[9] SSRs are official interpretations of law and regulation issued by the Social Security Administration. Although they do not have the force of law, they are binding on ALJs and entitled to some deference from courts, and an ALJ's failure to comply with an SSR can constitute error requiring remand under at least some circumstances. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1229 (9th Cir. 2009); *Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006); *Quang Van Han v. Bowen*, 882 F.2d 1453, 1457 n.6 (9th Cir. 1989).

Syndrome/complex Reg'l Pain Syndrome, 2003 WL 22399117, at *2 (S.S.A. Oct. 20, 2003).  Dr.

Matsui's reference to "the diagnosis of CRPS," AR at 2318, therefore may have warranted further

consideration by the ALJ as to whether there is evidence of Type I CRPS such that SSR 03-2p is

relevant here.  Because this specific issue of CRPS was not briefed by the parties, however, the

Court does not rely on it as a basis for reversal.

        The ALJ also concluded that "the record does not show that [A.B.'s] new [trigger finger]

symptoms could be expected to last a continuous period of at least 12 months."  AR at 30.  For

that specific condition, perhaps not—though it is not clear why the ALJ did not inquire further into

the prognosis for recovery of A.B.'s trigger finger symptoms.  But even assuming for the sake of

argument that A.B.'s trigger finger was not expected to last for at least a year,[10] the ALJ did not

identify any specific limitations associated with that condition that could be disregarded for failure

to meet the durational requirement for disability.

         As A.B. accurately notes in her reply brief, medical documentation of some of her finger-

related limitations in fact spanned more than a year.  *See* ECF No. 16 at 6.  She first reported pain

and swelling in a February 2022 questionnaire, indicating that it began in early January of that

year.  AR at 1765.  Notes from office visits on February 25th and 28th visits evince limited range

of motion, pain, and swelling, including that A.B. could not make a fist.  AR at 1757, 1769, 1771.

Her range of motion remained limited in all subsequent treatment records both before and after her

September 2022 surgery, through the final April 17, 2023 occupational therapy report in the

record—more than a year after the first documentation of such restrictions.  AR at 2344–45.  At

that time, touching her palm with her index finger, making a fist, and regaining full use of her

hand for activities of daily living and kitchen tasks were still aspirational goals.  AR at 2343,

2346.  The Court has identified no indication in the record that A.B. regained full range of motion

in her finger during the period of approximately fourteen months (through the end of available

records) that she received treatment for it.

        Even though A.B.'s treatment providers set goals for improvement, they noted repeatedly

---

[10] On remand, this question can presumably be resolved more conclusively based on developments
beyond the April 2023 endpoint of the administrative record currently before the Court.

that her exercises were not as effective as they should be—despite A.B. spending hours per day on them—and that the longer it took her to show more progress in regaining range of motion, the harder it would be for her to do so. *E.g.*, AR at 2027–29. Notes throughout the record indicate that improvement would "take time." *E.g.*, AR at 2334. The final treatment note in the record, from April 2023, indicated that it "may take up to a year to see the full potential of the hand," with no indication that such "potential" would mean complete recovery. AR at 2346. Other than goals for recovery that list an apparently generic target of twelve weeks, which continue to appear through the end of the available record around seven months after A.B.'s surgery, *see* AR at 2343, the Court has not identified any evidence contradicting A.B.'s testimony that her doctors told her she would probably not make a full recovery—testimony that the ALJ did not address in her decision.[11]

The ALJ also emphasized that the first report of A.B.'s finger symptoms occurred in early 2022, "almost two years after the alleged [disability] onset date," and that the "record does not show complaints or findings warranting limitation dating back to 2020." AR at 30. But a later onset of disability is not a reason to deny an application in its entirety. ALJs routinely assess onset dates later than claimants seek in their applications, and the Social Security Administration has promulgated procedures for them to do so. *See, e.g.*, *Diedrich v. Berryhill*, 874 F.3d 634, 638–40 (9th Cir. 2017) (reversing an ALJ's decision for failure to comply with a Social Security Ruling requiring medical expert testimony to determine an ambiguous onset date). The ALJ does not specifically state that the late onset of A.B.'s finger dysfunction is a reason to reject it altogether, but to the extent that such an implication could be drawn, that premise is contrary to law.

The ALJ erred by failing either to credit A.B.'s testimony regarding her hand impairment or to provide sufficiently specific and convincing reasons for rejecting such testimony. That error is not harmless, because A.B.'s professed need to do many daily tasks one-handed (as well as her

---

[11] To the extent the ALJ had any doubt as to the veracity of that testimony, the ALJ presumably could have sought confirmation from Dr. Matsui. *See Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003) ("The ALJ always has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered even when the claimant is represented by counsel." (cleaned up)).

United States District Court
Northern District of California

1    propensity to drop things) is not redressed by a "limitation to light lifting and carrying," *cf.* AR at

2    30, and the residual functional capacity that the ALJ assessed included no further limitations that

3    would account for A.B.'s finger dysfunction.

4           **B.**        **Assessing A.B.'s Finger Impairment Requires Further Proceedings**

5          "When the ALJ denied benefits and the court finds error, the court ordinarily must remand

6    to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*,

7    880 F.3d 1041, 1045 (9th Cir. 2017).  The Ninth Circuit recognizes a narrow exception for certain

8    cases where the Commissioner improperly found a claimant or doctor's opinions not credible.

9    That "credit-as-true" rule applies only when the following three elements are established:

> 10    (1) the record has been fully developed and further administrative
> 11    proceedings would serve no useful purpose; (2) the ALJ has failed to
> provide legally sufficient reasons for rejecting evidence, whether
> 12    claimant testimony or medical opinion; and (3) if the improperly
> discredited evidence were credited as true, the ALJ would be required
> 13    to find the claimant disabled on remand

14    *Garrison*, 759 F.3d at 1020 (emphasis added).

15          "When all three elements of this . . . rule are satisfied, a case raises the 'rare circumstances'

16    that allow [a court] to exercise [its] discretion to depart from the ordinary remand rule." *Treichler*

17    *v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014).  Courts may apply the credit-

18    as-true rule only if crediting a claimant's testimony or a medical opinion would "leave not the

19    slightest uncertainty as to the outcome of the proceedings."  *See id.* 1100–01.

20          Here, even if the ALJ credited A.B.'s symptom testimony regarding her hand impairments,

21    the ALJ would still need to exercise judgment to translate those symptoms to specific limitations

22    in her residual functional capacity.  As A.B. notes in her opening brief, the symptoms described in

23    her testimony, as well as in records from her orthopedic appointments and occupational therapy,

24    are "*possibly* the difference between adding the limitation of occasional fingering to the RFC

25    assessed by the ALJ."  ECF No. 11 at 9 (emphasis added).  Such possibility does not establish the

26    certainty needed for a court to apply the credit-as-true rule and direct an award of benefits.  *See*

27    *Treichler*, 775 F.3d at 1100–01.

28          A.B. contends that Dr. Lewis's assessment of a limitation to only occasional fingering

should also be taken as true, and warrants an award of benefits in light of the "VE testifying that the only unskilled jobs available at sedentary and light exertional capacities accommodating occasional fingering would require public contact in response to a hypothetical including no public contact and limitations with fingering."  ECF No. 16 at 6–7.  Assuming for the sake of argument that the ALJ erred in rejecting Dr. Lewis's opinions (which are not entitled to the same requirement of clear and convincing reasons as A.B.'s testimony), there are at least two reasons that those opinions would not support an award of benefits under the credit-as-true rule.

First, though not addressed by the ALJ or the parties, another page of Dr. Lewis's report indicates that A.B. was capable of "frequent" fingering, thus introducing uncertainty as to what Dr. Lewis intended to convey in her assessment.  AR at 2055.  The ALJ would need to resolve that ambiguity on remand.

Second, the hearing transcript suggests that the ALJ did not intend her hypothetical (and thus the RFC she assessed) to exclude telephone contact with the general public:

> A [by the VE] So, I may have a question for you regarding public contact. Does that include by phone?
>
> Q [by the ALJ]  No, it does not include by phone? [sic; question mark in original]
>
> A So, in person?
>
> Q Yes.

AR at 54.  Whether the ALJ actually intended to allow for such telephone contact might warrant clarification on remand, as might the question of whether A.B. is in fact capable of performing a job that requires extensive telephone contact with the public.  It is also not clear whether the two jobs the ALJ identified (election clerk and callout operator) are available in significant numbers, as is necessary for a finding of non-disability at Step 5.  But the Court cannot say with the requisite certainty that the Commissioner would be required to find A.B. disabled if a limitation of occasional fingering were added to her RFC.

Accordingly, the question of whether the ALJ erred in rejecting Dr. Lewis's opinions would not affect the conclusion that remand for further proceedings is necessary.  The Court therefore does not reach that issue, but encourages the Commissioner to consider it further on

1   remand.

2   **C.      Other Potential Errors Also Would Not Preclude Further Proceedings**

3   A.B. asserts a number of other errors by the ALJ, including with respect to her treatment of

4   A.B.'s ability to stand and walk and A.B.'s mental impairments.  Assuming for the sake of

5   argument that the ALJ so erred, A.B. has not shown that any such error would require an award of

6   benefits.

7   Beginning with A.B.'s physical impairments, the VE testified that at least some jobs would

8   be available for someone with the RFC assessed by the ALJ even if limitations to sedentary work

9   and occasional fingering were added (perhaps subject to some question of whether the RFC

10  allowed telephone contact with the public, as discussed above).  AR at 56.  The only testimony or

11  medical opinion evidence that A.B. contends the ALJ purportedly erred in disregarding relate to

12  limitations to standing, walking, and fingering.  *See* ECF No. 11 at 8–9, 11–13, 15–16.  It is

13  possible that any of those limitations might support a finding of disability based on the weight of

14  the evidence on remand, but on the record currently available, none of them so clearly establish

15  disability as to "leave not the slightest uncertainty as to the outcome of the proceedings."  *See*

16  *Treichler*, 775 F.3d at 1100–01.

17  The issue of mental impairments presents a different barrier to a judicial award of benefits.

18  Unlike the evidence of physical impairments discussed above, some of the psychological opinion

19  evidence in the record, if credited as true, would plainly establish that A.B. is disabled at Step 3.

20  Dr. Laura Jean Catlin's report, for example, diagnosed A.B. with major depressive disorder

21  (among other diagnoses) and assessed marked or extreme limitations in each of the Paragraph B

22  criteria.  AR at 1491–94.  That assessment would more than meet the criteria for Listing 12.04

23  (Depressive, bipolar and related disorders).  But the record also includes opinion evidence to the

24  contrary, including Dr. Stafford's report finding no more than moderate impairment in any

25  functional category.  AR at 2065–68.  That assessment, if accurate, would not meet or equal any

26  listed mental health impairment.  The Court need not reach the question of whether A.B. can

27  establish error in, for example, the ALJ's failure to address more specifically (or further develop

28  the record as to) the tension between Dr. Stafford's ultimate conclusions and A.B.'s extremely low

27

scores on the memory tests Dr. Stafford administered, *see* AR at 2064, or in the ALJ's reasons for affording little weight to other psychological opinion evidence.  Even if so, the record would still include contradictory opinion evidence from multiple psychologists who had similar opportunities to examine A.B.  Such discrepancies leave more than "the slightest uncertainty as to the outcome of the proceedings," and fall to the ALJ to resolve.  *See Treichler*, 1100–01.

Accordingly, because A.B. has not identified evidence establishing disability with sufficient certainty, her request for a judicial award of benefits is DENIED, and the case is remanded for further administrative proceedings.  Although the Court is cognizant of the delay that further proceedings might cause in resolving A.B.'s application, Ninth Circuit precedent dictates that "such costs are a byproduct of the agency process, and do not obscure the more general rule that the decision of whether to remand for further proceedings turns upon the likely utility of such proceedings."  *Id.* at 1106 (citation and internal quotation marks omitted).

### D.    Further Concerns

The Court's declining to reach those issues because they do not affect the outcome of this civil action should not be construed as either an endorsement or a rejection of A.B.'s arguments.  That said, two issues stand out as of particular concern.

First, the ALJ's determination that A.B. could stand and walk for up to six hours in a workday (contrary to her own testimony and Drs. Lewis and Woodcox's more restrictive assessments) appears to rest primarily on observations of normal gait and imaging, limited complaints to medical providers, and her reported activities around the house.  AR at 29.  The ALJ does not, however, specifically cite any direct evidence of A.B.'s ability to stand or walk for sustained periods of time.  The Court need not and does not reach the question of whether that determination was error in light of the evidence cited by the ALJ or relatively normal walking ability in at least some circumstances.  And as discussed above, A.B.'s ability to stand and walk might or might not prove to be material to the ultimate question of disability.  But the Commissioner is encouraged to consider this issue on remand, and—if the Commissioner's conclusion remains the same—to provide a more fulsome explanation of how the evidence on which the ALJ relied demonstrates a sustained ability to stand and walk for up to six hours in a

1    workday.

2       Second, the ALJ rejected Dr. Catlin's opinion that A.B. would miss four days of work per

3    month, AR at 1494, and Dr. Toews's testimony that she would miss more than three days per

4    month due to social anxiety, AR at 49, apparently based at least in part on the ALJ's determination

5    that A.B. exhibited normal social interactions with care providers and engaged in activities like

6    visiting Disneyland and assisting with her son's Scout troop camping trip.  AR at 32–33.  But

7    despite finding Dr. Stafford's opinions "generally persuasive," AR at 31, the ALJ did not address

8    her assessment that A.B.'s "ability to maintain regular attendance in the workplace is mildly

9    impaired," AR at 2066.  It is not clear whether the ALJ rejected that opinion, or how a "mild"

10   impairment in attendance would translate to absences at work.

11      Moreover, while A.B.'s own testimony did not directly address the question of workplace

12   attendance, the ALJ appears to have considered her related testimony "that she has had to cancel

13   medical appointments due to panic attacks" not fully credible because "the record shows only that

14   she cancelled an appointment in February 2023 because she was at lake Tahoe."  AR at 27–28.

15   Though not addressed in A.B.'s briefs, that is not an accurate characterization of the record, which

16   includes several other instances of A.B. canceling, rescheduling, or missing appointments.  For

17   example, there is a note of A.B. having failed to show up for a primary care appointment on April

18   22, 2022, with no reason given.  AR at 1850.  There are also several records of A.B. canceling or

19   rescheduling appointments due to illness or scheduling conflicts.  AR at 1871, 1902, 1904, 2236.

20   It is not obvious whether any of those instances would alter the ALJ's overall assessment of

21   A.B.'s testimony that she canceled appointments due to panic attacks, or whether that testimony or

22   Dr. Stafford's assessment of mildly impaired workplace attendance would support a finding of

23   disability even if credited, but the Commissioner is encouraged to revisit these issues on remand.

24      These issues are not intended to be exhaustive, or to limit the issues that the Commissioner

25   may wish to address or revisit on remand.

26   **V.    CONCLUSION**

27      For the reasons discussed above, the decision of the Commissioner finding A.B. not

28   disabled and denying her application for supplemental security income is REVERSED, and the

United States District Court
Northern District of California

case is REMANDED for further administrative proceedings consistent with this Order.  The Clerk

shall enter judgment in favor of A.B. and close the case.

**IT IS SO ORDERED.**

Dated: September 22, 2025

LISA J. CISNEROS
United States Magistrate Judge